OPINION OF THE COURT
Kenneth R. Fisher, J.
This matter involves a venerable local business, Maynards Electric Supply, Inc. and the brothers who are its sole shareholders and directors. Plaintiff, Glenn M. Heilman, holds the positions of vice-president and secretary, and defendant, Bruce Hellman, is the president and treasurer of Maynards. Glenn Heilman challenges a lease signed on behalf of the corporation by his brother, Bruce Heilman, largely on the ground that the lease was not preapproved by the board of directors.
Glenn M. Heilman moves for an order awarding him summary judgment as follows: (1) declaring that Bruce Heilman executed a lease in June 2005 with defendant Stockwood without authority from Maynards Electric Supply, Inc.; (2) declaring that the lease with Stockwood is a nullity and unenforceable;
(3) determining that the payments Bruce Heilman caused Maynards to make to Stockwood constitute a waste of corporate assets, requiring Bruce Heilman to account for those payments, with interest, and to indemnify Maynards for all other damages incurred as a result of the making of the lease with Stockwood;
(4) determining that Stockwood has been inequitably enriched by its receipt of payments from Maynards, and directing that Stockwood reimburse Maynards, with interest, for the amount of the payments made to date; and (5) directing Bruce Heilman to indemnify plaintiff for the attorneys’ fees and expenses he *697 incurred in the prosecution of this derivative action, upon an appropriate showing. Bruce Heilman cross-moves for an order granting him summary judgment pursuant to CPLR 3212.
Defendant, Stockwood, LLC, the third party with whom the disputed lease was made, cross-moves for an order awarding it the following relief: (1) denying Glenn Heilman’s motion for summary judgment; (2) awarding summary judgment to Stock-wood, LLC dismissing Glenn Heilman’s complaint; and, alternatively, (3) in the event Stockwood’s cross motion is denied and Glenn Heilman’s motion is granted, summary judgment on its cross claims against Bruce Heilman, awarding Stockwood any and all losses, damages, and sums of money that may be ordered by the court to be paid by Stockwood as reimbursements, and that Bruce Heilman be further required to perform the terms and conditions of the parties’ lease agreement and otherwise defend and indemnify Stockwood for any damages sustained herein.
Facts
Maynards is a local Rochester business engaged in the wholesale distribution of electrical supplies. It is a family-run business that was founded in the 1950s by the late Maynard Heilman. Bruce Heilman is the eldest child, followed by Glenn Heilman and his twin brother Neil. Maynard Heilman also had a daughter named Jeanne who is not involved in this litigation other than as one-quarter owner of the North Clinton Avenue building that would be vacated if the Stockwood lease is sustained.
Maynard Heilman retired from the family business in the mid-1980s and subsequently died in 2005. Bruce Heilman became president of Maynards upon his father’s retirement and continues to hold that position to this day. Glenn and Neil Hellman worked as salaried officers. In the early 1990s, the Hellman brothers became the sole shareholders, each owning an equal amount of shares. In 1997, Neil Heilman sold his shares to the corporation in a redemption transaction, leaving only Bruce and Glenn Heilman as current shareholders in Maynards. Bruce and Glenn Heilman each own 50% of the issued and outstanding shares, and they are also the only two members of the board of directors. Both are actively employed at Maynards.
At the end of 2005, the 10-year lease under which Maynards occupied the family-owned North Clinton Avenue building was scheduled to expire. Maynards occupied the North Clinton Avenue property since 1985, and the property, formerly owned by *698 Maynard Heilman, is currently owned jointly by Bruce, Glenn, Neil, and Jeanne Heilman.
At some point in 2004, Bruce Heilman began discussions with David Appelbaum, principal of defendant Stockwood, concerning a possible purchase of two vacant buildings on Carter Street. It is alleged that Bruce Heilman was negotiating for his own account during these early discussions. For personal and financial reasons, Mr. Appelbaum determined he did not want to sell the properties. At that point, Bruce Heilman began personally paying Stockwood a $3,500 per month option to keep the Carter Street buildings off the market.
By the end of 2004, Bruce Heilman advised Glenn Heilman that he wanted to lease the larger of the two Carter Street buildings and move the North Clinton Avenue operations to that building. Bruce Heilman alleges that continuing to lease the family-owned North Clinton Avenue property was not a good deal for the company and that the Carter Street properties had numerous advantages despite the higher rent proposed by Stock-wood. Glenn Heilman voiced his concerns and dissatisfaction with such a move through letters to Bruce Heilman, exchanged by the brothers through their respective attorneys. On December 21, 2004, Glenn Heilman’s lawyer, Frank T. Crego, advised Bruce Heilman’s lawyer that his client had insufficient information to evaluate the proposed relocation, and he warned that Bruce Heilman was without authority to make commitments on behalf of the corporation. The exchange of letters between the brothers (through counsel) continued into 2005. On April 18, 2005, Bruce Heilman’s lawyer, Justin E Doyle, submitted to Glenn Heilman a proposed lease agreement between Maynards and Stockwood, together with Bruce Heilman’s arguments in favor of relocation. On May 12, 2005, Mr. Crego responded, in general rejecting the relocation, and pointing out that the existing lease at the family-owned site offered more favorable terms upon a 2005 renewal, and insisting that Bruce Heilman had not justified his projections of cost savings upon a move to Carter Street. Mr. Crego further asserted that Bruce Heilman had no authority to enter into a lease on behalf of the corporation. Notwithstanding, on May 31, 2005, Bruce Heilman announced that Maynards would not be renewing the North Clinton Avenue lease, which expired at the end of June.
Glenn Heilman decided to inspect the Carter Street properties with his brother, Neil, on June 3, 2005. Glenn Heilman alleges that, after touring the building, he advised Mr. Appelbaum *699 that “the company had not approved or authorized the lease for 900 Carter Street.” (Affidavit of G. Heilman, dated Nov. 23, 2007, at 1Í 48.)
Later that month, however, on June 29, 2005, Bruce Heilman, on behalf of Maynards, and Mr. Appelbaum, on behalf of Stock-wood, executed a five-year lease agreement for 900 Carter Street. Bruce Heilman signed the lease agreement, “Bruce Hellman Pres.” Glenn Heilman learned of the lease shortly after its execution via a letter from Bruce Heilman enclosed with his pay envelope. The letter indicated that a move in the fall of 2005 was anticipated. At Glenn Heilman’s request, Mr. Crego sent a letter dated July 7, 2005 to Mr. Appelbaum, which maintained that Maynards had not approved the lease.
As of the date of this decision, though rent has been paid by Maynards since October 2005, Maynards has not moved from North Clinton Avenue to 900 Carter Street. Bruce Heilman alleges that the move was delayed because of this litigation, and Glenn Heilman’s threats to commence additional litigation seeking injunctions to stop the move. (Affidavit of B. Heilman, dated Jan. 4, 2008, 1Í 58.) Bruce Heilman acknowledges, however, that his decision to delay pending a quick resolution of this action was “unfortunate,” as market conditions and other internal events left Maynards without adequate financing from its lenders to complete the move. (Id.) At this point in time, however, Bruce Heilman represents that Maynards’ difficulties have been resolved and that now he is awaiting the outcome of this litigation to complete the move. (Id. U 59.)
Glenn Heilman commenced this action in August 2005 stating one “claim for relief’ consisting of several assertions: (1) that Bruce Heilman did not have unilateral authority to execute the lease without the prior affirmative vote of the board of directors, (2) that the Stockwood lease will result in a waste of corporate assets, (3) that the lease should be set aside and declared null and void, (4) that Stockwood refund all lease payments made by Maynards, and (5) that Bruce Heilman account and reimburse the corporation for any damages occasioned by the lease together with an award of attorneys’ fees to Glenn Heilman. Bruce Heilman’s answer states several affirmative defenses and no counterclaim. The affirmative defenses stated are: failure to state a claim; lack of proximate cause; contribution; good faith on Bruce Heilman’s part; lack of legally cognizable damage; failure to comply with New York legal requirements for a derivative action; and other defenses that may arise *700 during discovery. Stockwood’s answer alleges lack of standing and failure to state a cause of action as affirmative defenses. Additionally, as both an affirmative defense and cross claim, Stockwood alleges that it is entitled to a defense and indemnification from Bruce Heilman.
Maynards’ Bylaws
Business Corporation Law § 701 provides that “the business of a corporation shall be managed under the direction of its board of directors.” (Emphasis supplied.) Business Corporation Law § 715 (g) provides that “[a]ll officers as between themselves and the corporation shall have such authority and perform such duties in the management of the corporation as may be provided in the by-laws or, to the extent not so provided, by the board.” With respect to the board of directors, article III of the bylaws states, in relevant part:
“1. BOARD OF DIRECTORS
“Subject to any provision in the certificate of incorporation the business of the corporation shall be managed by its board of directors, each of whom shall be at least 21 years of age and need not be shareholders.”
This is simply a restatement of Business Corporation Law § 701. Concerning the duties of the president, the bylaws state in article IV:
“3. PRESIDENT
“The president shall be the chief executive officer of the corporation; he shall preside at all meetings of the shareholders and of the board; he shall have the management of the business of the corporation and shall see that all orders and resolutions of the board are carried into effect.”
The bylaws thus provide that the board of directors will manage Maynards’ business, and that the president “shall be chief executive officer of the corporation” and “shall have the management of the corporation.” No limitations of any sort are placed upon the president in fulfilling management duties as chief executive officer. In the absence of any express restriction in the bylaws or otherwise, the actual conduct of the business by its president must inform the decision whether the president had the presumptive power to enter into the lease without the prior authorization of the board of directors. (New York Metro Corp. v Chase Manhattan Bank, N.A., 52 NY2d 732, 734 [1980] [“other evidence . . . from which the jury could have concluded that (corporate president) had authority . . . unrelated to any *701 specific corporate resolution” required submission of that discrete issue to the jury]; Weber v Loft Candy Corp., 277 App Div 1005 [2d Dept 1950] [“Proof is material with respect to the custom of the corporation and authority of the sales manager and president”]; Camacho v Hamilton Bank Note & Engraving Co., 2 App Div 369, 371 [1st Dept 1896] [“the words ‘general manager’ would import that the person bearing that title is a general executive officer for all the ordinary business of the corporation is all that may properly be inferred”; “In the absence of proof of what exact authority belongs to a person descriptively styled a general manager, there is no rule by which a court can be guided in determining what the powers of such an official really are, except such as the evidence in a particular case may furnish of what the person has done in the general course of the business of the corporation”].)
Moreover, for purposes of determining implied actual authority of a president, as distinguished from apparent authority (2 White, New York Business Entities ¶ B715.06 [4], at 7-167 — 7-171 [14th ed] [“Proper Classification of Implied and Apparent Authority”]),[1] the actual history of the board’s knowledge of the corporate president’s routine management of the business without objection must be considered. (Sun Printing & Publishing Assn, v Moore, 183 US 642, 650-651 [1902] [inasmuch as “the trustees of the Sun Association must be presumed to have exercised a supervision over the business of the corporation, they are to be charged with knowledge of the extent of the power usually exerted by its managing editor, and must be held to have acquiesced in the possession by him of such authority, even though they had not expressly delegated it to him”]; 2 White, New York Business Entities 1i B715.06 [2], at 7-158 [14th ed] [“one of the facts that may demonstrate implied authority is a continued course of dealings in which an agent has been permitted to perform the act in question”]; id. 1i B715.07 [4], at 7-182 [“(c)ourts, which have said that a president will be *702 presumed to have the authority to bind the corporation in ordinary contract dealings, have uniformly been commenting on officials who are (1) expressly made general managers, or (2) impliedly considered general managers because the corporation has acquiesced in the habitual performance of the duties of their position as if they were general managers”].)
Here, the depositions of both Bruce Heilman and Glenn Heilman reveal the historical workings of Maynards and they compel a finding that Glenn Heilman fails to establish prima facie as a matter of law that Bruce Heilman lacked actual implied authority to execute the lease, requiring a denial of Glenn’s motion for failure to meet his initial burden on summary judgment.[2] At the same time, the court finds that Bruce Heilman has met his initial burden on summary judgment to show that, indeed, he had presumptive implied authority to execute the lease with Stockwood without preapproval from the board of directors, and even when he knew that Glenn Heilman would object at a duly convened board meeting if one were scheduled. Because of the wholly divergent views of applicable law presented by the parties, these two discrete rulings are the subject of the following exegesis. Thereafter, the court will consider whether Glenn Heilman raises an issue of fact on Bruce Heilman’s motion warranting a trial.
Both depositions demonstrate that decisions of corporate management were not made by a vote of the board of directors and that Bruce Heilman, as president of Maynards, made most, if not all major decisions (as had his father before him), taking into consideration input from Glenn Heilman only as he saw fit: “Q. Did you consult with Glenn regarding decisions for the company?
“A. No.
“Q. Okay. Did you tell him, before you made any decisions for the company, what you were going to do?
“A. Very seldom.
“Q. Why?
“A. Because that’s the way it had been done for the last 30 years.
“Q. Did Glenn ever object during that time period to any decision that you had made on behalf of the company?
*703 “A. Very few.
“Q. And. in the instances in which Glenn objected, what did you do about it?
“A. Nothing.” (Deposition transcript of B. Heilman at 24, lines 8-23.)
“Q. If you had objected to the lease for 1776 North Clinton, would you have expected your dad to go forward with it anyway?
“A. Yes.
“Q. Why?
“A. Because that was my dad.
“Q. And do you believe at the time that the North Clinton facility lease was first executed, you had authority to object to the entry of the lease?
“A. Authority?
“Q. Yes.
“A. No.
“Q. Notwithstanding your position as a Director? “A. No.
“Q. What was your dad’s position at the time?
“A. President.” (Id. at 34, lines 5-21.)
“Q. And at the time of the amendments to the rent, who made the decision to—
“A. Maynard.
“Q. Did you play a role in that decision?
“A. Absolutely none.” (Id. at 42, lines 17-21.)
“Q. When your dad made the offers to reduce the rent and reduce the square footage, did you go to Glenn and say that your dad had done that?
“A. No.
“Q. Did you involve Glenn in any of the negotiations regarding an extension with your dad?
“mr mcguirk: Objection to form.
“A. No.
“Q. Why not?
“A. Because I never did before.” (Id. at 48, lines 14-23.)
“Q. And is it your position that such decisions other than selling the company can be made by you irrespective of whether the other Director or shareholder objects?
“A. Been that way for 46 years.
*704 “Q. So is the answer ‘yes’?
“A. Yes.” (Id. at 55, lines 9-15.)
“Q. The part of the sentence that reads ‘the business of the corporation shall be managed by its Board of Directors’—
“A. Yes.
“Q. —can you tell me what decisions of the company fall within that part of the bylaws?
“And, again, without invading the attorney-client privilege, can you tell me what your understanding of that sentence is?
“A. The meaning is that the Board of Directors can run the corporation.
“Q. But if the President, as you stated, has the right to make decisions other than selling the company, what is the meaning — excuse me — what is the authority of the Board of Directors in this paragraph? . . .
“A. This piece of paper is not how the corporation has worked in its 51 years of existence. We don’t have Board meetings, so . . .
“Q. But you have a Board of Directors?
“A. Yes, we do, but we don’t have Board meetings.” (Id. at 56, lines 10-25; 57, lines 5-10.)
“Q. So if I understand you correctly, if Glenn objects to something but you disagree with his opinion, you believe you have the authority to go ahead and do it as the President of the company?
“mr mcguirk: Object to the form.
“A. Yes.
“Q. When was the last time a shareholder meeting was held?
“A. Couldn’t tell you.
“Q. And do you remember the last time a Board of Directors’ meeting was held?
“A. Couldn’t tell you.
“Q. Have there ever been Board of Directors’ meetings, to your knowledge?
“A. I can’t remember.
“Q. There have been resolutions, though, that have been passed by the Board of Directors, right?
“A. Yes.
*705 “Q. And. what was the process by which those Board of Directors’ meetings — excuse me — minutes were passed?
“A. My father or Sam would hand you a piece of paper and say, ‘Sign this.’
“Q. And did that occur after there had been discussion regarding the subject matter of the resolution?
“A. Sometimes, if it was discussed. Sometimes just happened after we did it.
“Q. So the process was pretty informal?
“A. Beyond informal.” (Id. at 62, line 25; 63, lines 2-25; 64, lines 2-7.)
Glenn Heilman’s deposition transcript provides further insight into the business management of Maynards:
“Q. Well, you said ‘minutes’ in response to my question about a meeting. Was there a meeting of the Board of Directors?
“A. Our meetings were minutes that we signed off on.
“Q. So the people didn’t physically get together and discuss this issue?
“A. We would discuss them day-to-day in the course of doing business. But, no, as far as I remember, I don’t remember formal meetings, but I do remember minutes.
“Q. Can you recall when the last Board of Directors’ meeting was?
“A. I don’t remember.” (Deposition transcript of G. Hellman at 42, lines 12-25.)
Glenn Heilman also acknowledged a plethora of management decisions made by Bruce Heilman alone, without express board preapproval, including obtaining insurance coverage, hiring and firing, extending customer credit, commencing litigation, setting compensation, and purchasing equipment and inventory. (Id. at 79, 82, 92-95, 126.) According to Glenn, Bruce Heilman was the main point of contact with the banks (id. at 68-69) and in hiring the company’s accountant. (Id. at 75-76.) Bruce Hellman also has submitted uncontradicted affidavits to the effect that he entered into leases on behalf of the company as business needs warranted, a fact confirmed in part by Glenn in his deposition. (Id. at 100-102, 104-106.) Glenn Heilman also acknowledged in his deposition that his brother “generally” would be unrestricted in carrying out his management responsibilities *706 unless the board interposed a restriction of some sort. (Id. at 121-122.) But Glenn Heilman maintained in his testimony that he held a subjective belief (Glenn’s additional examples given in his reply affidavit are treated below), not referenced to any objective circumstances justifying the belief, that Bruce needed his approval for such transactions as the lease at issue in this litigation, and other sundry transactions.
Thus, Bruce Heilman establishes prima facie that, historically, he (and his father before him when he was president) had plenary management authority, in fact made virtually all management decisions for Maynards, and that the board of directors did not meet except via the few times minutes were circulated for signature. The evidence further demonstrates, particularly through the transcript of Glenn Heilman’s deposition, that Glenn was content to have Bruce Heilman make most of the decisions for Maynards, and that he interjected his opinion (and expected it to be heard) when a topic arose that particularly interested him, but otherwise generally went along with Bruce’s decisions until the matter of the Stockwood lease arose. Even as to the Stockwood lease, the evidence shows that Glenn wrote a letter to his brother at one point in the fall before the lease was executed in which he agreed to the relocation to Carter Street.
On this showing, the president of the corporation, whether when held by Bruce Heilman or his father, was the “general manager” of the corporation as that term has come to be known under our law. (Phoenix Fin. Corp. v Iowa-Wisconsin Bridge Co., 41 Del 130, 139-140, 16 A2d 789, 793 [1940] [“A general manager, is as the term indicates, a manager for all the general purposes of the corporation, and has implied authority to do anything that the corporation could do in the general scope and operation of its business”]; 2A Fletcher, Cyclopedia of Corporations § 667 [“extent of a general manager’s authority depends to a great extent upon the nature of the business and the degree of control placed in the agent”]; Camacho v Hamilton Bank Note & Engraving Co., 2 App Div 369, 371 [1896] [same]; 2 White, New York Business Entities ¶ B715.07 [2], at 7-176 — 7-180 [14th ed].) Without reploughing the ground covered in the last cited treatise, and the relevant New York cases, the state of the law was ably summarized by Judge L. Hand as follows:
“The law as to the prima facie authority of a president or other general officer of a corporation is not very clear. Unquestionably there has been a ten *707 deney of late to imply greater authority and to throw upon the corporation the duty of showing that in fact the directors have not authorized the particular powers exercised. The Court of Appeals of New York has indeed twice said without limitation that a president presumptively has any powers which the directors have authority to give him or could ratify, Patterson v. Robinson, 116 N. Y. 193, 200, 22 N. E. 372; Hastings v. Brooklyn Life Ins. Co., 138 N. Y. 473, 479, 34 N. E. 289; though the decisions cited do not support so far reaching a doctrine. In Oakes v. Cattaraugus Water Co., 143 N. Y. 430, 436, 38 N. E. 461, 26 L. R. A. 541, it appeared that the president had full charge of the business and the case really does not stand for the rule. In Watkins Salt Co. v. Mulkey (C. C. A.) 225 F. 739, our decision was to the contrary; but in Hotel Woodward v. Ford Motor Co. (C. C. A.) 258 F. 322, we accepted the presumption without limitation, though it appears from the later report of the same case (C. C. A.) 271 F. 625, that it was unnecessary to the decision. How far it was part of our ruling in Ransome Concrete Machinery Co. v. Moody (C. C. A.) 282 F. 29, is not clear. In the last three cases we were professing to follow New York law, and the Court of Appeals has more recently twice expressly decided that there were limitations on the doctrine. Heaman v. Rowell Co., 261 N. Y. 229, 185 N. E. 83; Powers v. Schlicht H. L. & R Co., 23 App. Div. 380, 48 N. Y. S. 237, affirmed on opinion below, 165 N. Y. 662, 59 N. E. 1129. How far a similar ruling was involved in Bankers’ Trust Co. v. International R. Co., 207 App. Div. 579, 202 N. Y. S. 561; Id., 239 N. Y. 619, 147 N. E. 220, and in Large v. Wire Wheel Corp., 223 App. Div. 134, 227 N. Y. S. 449; Id., 250 N. Y. 531, 166 N. E. 312, it is impossible to say, for the Court of Appeals did not write; but at least the opinions below assumed that not all contracts which the directors may authorize are presumptively within the president’s authority. In Hardin v. Morgan Lithograph Co., 247 N. Y. 332, 338, 339, 160 N. E. 388, 390, although Hastings v. B. L. Ins. Co., supra, 138 N. Y. 473, 34 N. E. 289, was quoted, the presumption was limited to ‘such ordinary contracts as custom and the necessities of business would justify or require.’ The contract there at bar was not an unusual one; nor was that
*708 before the court in Twyeffort v. Unexcelled Mfg. Co., Ltd., 263 N. Y. 6, 188 N. E. 138, where the intimation was not justified that Pound, J., had intended in Hardin v. Morgan Lithograph Co., supra, 247 N. Y. 332, 160 N. E. 388, to adopt the unlimited form. The citation of Peck v. Dexter S. P. & P. Co., 164 N. Y. 127, 58 N. E. 6, in Hardin v. Morgan Lithograph Co., supra, shows that the president’s authority does not in this regard differ from that of any other officer.” (Schwartz v United Merchants & Mfrs., 72 F2d 256, 258 [2d Cir 1934].)
Accord Scientific Holding Co., Ltd. v Plessey Inc. (510 F2d 15, 24 [2d Cir 1974, Friendly, J.]), wherein it was stated:
“Although certain commentators have found this holding [in Schwartz] to be inconsistent with the Patterson-Hastings rule, see Note, Inherent Power As a Basis of a Corporate Officer’s Authority To Contract, 57 Colum.L.Rev. 868, 873 (1957), most subsequent New York cases, as well as federal cases applying New York law, have adopted the ‘ordinary business rule’, see, e. g., Kraus v. General Motors Corp., 120 F.2d 109 (2 Cir. 1941); O’Connor v. Bankers Trust Co., 159 Misc. 920, 946, 289 N.Y.S. 252, 283 (Sup.Ct. N.Y. Co. 1936), aff'm without opinion, 278 N.Y. 649, 16 N.E.2d 302 (1938); Lieberman v. Princeway Realty Corp., 17 A.D.2d 258, 233 N.Y.S.2d 1001 (1st Dept. 1962), aff’m without opinion, 13 N.Y.2d 999, 245 N.Y.S.2d 390, 195 N.E.2d 57 (1963) (mem.); Greenpoint Coal Docks, Inc. v. Newtown Creek Realty Corp., 5 Misc.2d 812, 814, 91 N.Y.S.2d 466, 469 (Sup.Ct. Kings Co. 1949); American Express Co. v. Lopez, 72 Misc.2d 648, 340 N.Y.S.2d 82, 83 (Civil Ct. N.Y.C. 1973) (chairman of the board). But see Best-Site Associates, Inc. v. Ventrice, 245 App.Div. 758, 280 N.Y.S. 583 (2d Dept. 1935) (per curiam citing Hastings for proposition that president has authority to do any act which directors could authorize or ratify; held to have authority to hire counsel and prosecute action there under consideration). ’ ’
Here, as in Oakes v Cattaraugus Water Co. (143 NY at 436), Bruce Heilman shows “that the president had full charge of the business.” (Schwartz v United Merchants & Mfrs., 72 F2d at 258; see also Lee v Pittsburgh Coal & Min. Co., 56 How Prac 373, 377 [NY Super Ct 1877] [“it often happens — so often as to *709 be the rule rather than the exception — that the chief officers of a corporation exercise a very wide range of powers, virtually grasping the entire direction and control of all its operations, with the tacit consent and approval of the corporation, though it has never by any direct vote or recorded act defined the nature or extent of their authority”], affd 75 NY 601 [1878].)[3]
Accordingly, Bruce Heilman establishes his presumptive power or authority to enter into the lease on behalf of the corporation without prior board approval. (2A Fletcher, Cyclopedia of Corporations § 691 [“general manager may of course agree to rent necessary premises for the offices or other business purposes of the corporation”]; see also Odell v 704 Broadway Condominium, 284 AD2d 52, 57 [1st Dept 2001] [apparent authority case, but observing: “Leitersdorf, as president of the board, had the power, whether actual, implied or apparent, to approve of the proposed construction and to bind the entire board”]; Arrow Communication Labs. v Pico Prods., 206 AD2d 922, 923 [4th Dept 1994] [noting that the president had authority to enter into contracts, “but only in the ordinary course of business ... If (the) agreement is found to be extraordinary or unusual, express authority would be required to enable (the president) to enter into it, and plaintiff would have to prove that such authority existed”]; A & M Wallboard v Marina Towers Assoc., 169 AD2d 751, 752 [2d Dept 1991].) Contrary to Glenn Heilman’s argument, a five-year lease of the kind at issue here is not an extraordinary or unusual contract for a business of this type, given the deposition and affidavit testimony that Bruce Heilman executed leases of this kind in connection with day-to-day business at Maynards’ various places *710 of operation, particularly when Maynards acquired a struggling concern in Jamestown, Olean and Hornell. (Sign Up USA, Inc. v JCF Assoc., LLC, 33 AD3d 905, 906-907 [2d Dept 2006] [“plaintiff made a prima facie showing of entitlement to judgment as a matter of law by demonstrating that Slone was an officer of Robson, and was the only individual who managed the day-to-day affairs of the corporation” and that “(t)herefore, he was authorized to enter into the lease in question on behalf of the corporation”]; William, Wicke Co. v Kaldenberg Mfg. Co., 21 Misc 79 [App Term 1897]; 2 White, New York Business Entities ¶ B715.07 [2] at 7-177 — 7-178 [14th ed] [placing “(1)easing premises for corporation use” as in the class of “ordinary contracts,” not extraordinary contracts requiring express board approval].) Accordingly, Glenn Heilman failed prima facie on his motion to establish that the president lacked the implied authority to execute the lease (cf. Polish-American Media, Inc. v Jozwiak, 29 AD3d 663, 664 [2d Dept 2006]), and on Bruce Hellman’s motion Glenn fails to raise an issue of fact on the issue of the presumptive power (cf. Mumford v Hawkins, 5 Denio 355, 359 [Sup Ct, NY County 1848] [evidence “left no ground on which the jury could lawfully find that the proceeding in chancery was not authorized by the bank”]).
To be sure, Glenn Heilman sought to defeat the application of this presumption even as applied to the proof Bruce Heilman submitted in support of his prima facie showing on summary judgment. Glenn Heilman refers to the warnings his lawyer gave to the corporate president and those he gave to Stockwood, both before execution of the lease and immediately thereafter, that Bruce Heilman had no authority to enter into the lease. In the context of the application of the presumption described above to these cross motions for summary judgment, however, it was incumbent on Glenn Heilman to adduce admissible evidence that the board voted to reject the lease and relocation the corporate president had presumptive authority to engineer. (TJI Realty v Harris, 250 AD2d 596, 597-598 [2d Dept 1998] [litigation started by president with presumptive power to do so subsequently “may not be maintained . . . if it is contrary to the duly-authorized directives of the board” — remanding for a determination of the validity of the subsequently adopted board resolution].)
Glenn Heilman relies in large part on Sterling Indus, v Ball Bearing Pen Corp. (298 NY 483 [1949]). In that case, it was held that the presumption which is involved in this case is rebutted, *711 or really does not even apply, when the board of directors failed to authorize the president to initiate a lawsuit when the board was afforded an opportunity to vote on the matter prior to the president’s action. The opportunity of the board to pass on the question before action by the president was the animating feature of this case, however, and it was this opportunity, and the failed 50-50 vote on the question, which invoked former General Corporation Law § 27 (now Business Corporation Law § 701), the provision Sterling Indus, proclaimed “cannot be circumvented.” (298 NY at 492.) A similar situation is not present here, where Glenn Heilman offers no admissible proof, or allegation even, that the board of Maynards was called to meeting, formal or otherwise, and he offers “no minutes as to corporate action taken in such capacity by them [as members of the board of directors], with respect to this action” in executing the lease by the corporate president. (328 E. 56 St. Rest, v Poll-don Rest., 39 AD2d 689, 691 [1st Dept 1972] [adding that although the principles of Sterling Indus, “are clear . . . , the facts which bring those principles into play are not so evident on this record as to call for their automatic application”].)[4] Bruce Heilman, however, establishes without contradiction that no board meeting has ever been convened on the issue of the Stockwood lease or the proposed relocation.
The Court of Appeals subsequently has made clear that the holding of Sterling Indus, “was dictated by the circumstances of that case, since ‘[a]ny actual or implied authority which [the president] may have had as president’ to bring suit was effectively ‘terminated when . . . the board . . . refused to sanction it’.” (West View Hills v Lizau Realty Corp., 6 NY2d 344, 348 [1959], quoting Sterling Indus., 298 NY at 490 [adding that “Sterling does not hold that under all circumstances the president is without authority to institute or defend litigation in the name of the corporation unless actually so authorized”].) Where “the board has taken no action” (6 NY2d at 348), there is no rebuttal of the presumptive powers of the president. (See also Matter of Paloma Frocks [Shamokin Sportswear Corp.], 3 NY2d *712 572, 575 [1958] [distinguishing feature is that, in Sterling Indus., the “president asked his board’s permission to bring the suit but there was a tie vote which this court treated as a refusal by the directors of permission”]; Rothman & Schneider v Beckerman, 2 NY2d 493, 497 [1957] [result in Sterling Indus. “turned largely on the fact( )” that “plaintiffs board of directors actually refused, when requested to act, to give the president permission”].)
A passage in Rothman & Schneider gives some pause: “Whether or not that course of conduct may in and of itself denote authority in one to act without the consent of the other, we need not say” (id. at 498). But the reservation was made in the context of a coequal governance of the corporation by 50% shareholders who “acted ‘as equals and as partners’, neither questioning the authority of the other, and both signing papers and verifying pleadings in litigation ‘indiscriminately’.” (Id.) Here, the evidence submitted in support of Bruce Heilman’s motion shows that Glenn Heilman fully acquiesced in his brother’s governance of the corporation for virtually if not all purposes until the events which prompted this lawsuit. There is no suggestion in Bruce Heilman’s deposition testimony or other proof submitted in support of Bruce’s motion that Glenn Hellman also enjoyed managerial function or authority over the corporation, nor is there any evidence that he did so with his brother’s consent or acquiescence. Even in reply, Glenn Hellman recounts a litany of management decisions made by his brother that he acquiesced in despite his contrary urgings, and that “[a]t Bruce’s behest, I manage our warehouse and counter operations,” i.e., Glenn’s daily job duties. (Reply affidavit K 15.) So the unanswered question posed in Rothman & Schneider is not presented in this case.
Therefore, when it is said in Sterling Indus, that (now) Business Corporation Law § 701 cannot be “read that the corporation shall be managed by its board of directors, except in the case of deadlock when it shall be managed by any director who happens to be president” (298 NY at 492), the authorities cited above make clear that the “deadlock” which prevents action by the president must result from an actual vote of the board rejecting the proposed action either by majority vote against or a 50-50 deadlock. In this case, because Bruce Heilman had the presumptive power to enter into the lease, there was no prior deadlock stripping the president of his powers to manage the corporation. Indeed, the deadlock, if any (because plaintiff of *713 fers no proof that the board convened after the lease was signed), would have occurred upon plaintiffs effort to obtain a board resolution rescinding the transaction. (Berma Mgt. Corp. v 140 W. 42nd St. Realty, 21 Misc 2d 571, 572-573 [Sup Ct, NY County 1960] [president’s presumptive power upheld, “there being no formal interdiction” and despite the “fact that the president in the instant case knew that two of the four directors opposed this action and deliberately failed to call a meeting to pass upon the question”], cited with approval in Roger J. Goebel, The Authority of the President Over Corporate Litigation: A Study in Inherent Agency, 37 St John’s L Rev 29, 76 [1962] [“lower court has quite properly so held even when the president deliberately refrained from calling a board meeting because he knew a deadlock would result”; “his presumptive powers prevailed since there was no ‘formal interdiction’ ”; extensively canvassing Sterling Indus, and the three major Court of Appeals cases since, set forth above, and fully embracing West View Hills].)
In plaintiffs original memorandum (at 20), he dismisses what he acknowledges was the lack of formal board action by reference to an amorphous futility rule applied in those cases holding that, “ ‘where there are only two stockholders each with a 50% share, an action cannot be maintained in the name of the corporation by one stockholder against another with an equal interest and degree of control over corporate affairs; the proper remedy is a stockholder’s derivative action’.” (Stone v Frederick, 245 AD2d 742, 744-745 [3d Dept 1997] [emphasis supplied], quoting Executive Leasing Co. v Leder, 191 AD2d 199, 200 [1993].) In the case in this line cited by plaintiff (Tidy House Paper Corp. of N. Y. v Adlman, 4 AD2d 619 [1st Dept 1957]), the Court found that the prior board action rejecting the suit initiated by the president, either by a majority vote or a 50-50 tie vote failing to authorize the same, was not required because “it could hardly be expected that if approval of the board of directors were sought, Adlman, who controlled 50% of the board, would have authorized the action against himself.” (Id. at 621.) The Court referred to its prior decision in Matter of Paloma Frocks (Shamokin Sportswear Corp.) (1 AD2d 640 [1st Dept 1956]), which “held that even though approval of the directors was not sought the result was the same as though approval had been expressly refused” (.Adlman, 4 AD2d at 621), a point upon which the Court of Appeals explicitly reversed. (Matter of Paloma Frocks, 3 NY2d at 575 [discussed above and which *714 incorporated the distinctions drawn in Rothman & Schneider (2 NY2d at 497-498) also discussed above].) While it is true that, in Adlman, the Court found another rationale for its decision which has survived the trilogy of Court of Appeals opinions since Sterling Indus., i.e., West View Hills (supra)1, Matter of Paloma Frocks (supra) and Rothman & Schneider (supra) (see e.g. Stone v Frederick, supra), the consideration driving the rule of Adlman, viz., whether a president’s presumptive power “applies when the president seeks to maintain an action [in the name of the corporation] against one who has as much control over the plaintiff corporation as the president himself’ (Adlman, 4 AD2d at 621), is not even remotely present here, where the president merely executes a contract/lease pursuant to his presumptive implied power as president notwithstanding objections from the 50% shareholder presented outside the context of the official corporate proceedings of the board.
Acceptance of plaintiffs argument drawn from the Adlman line of cases in a case such as this one also would run counter to the rejection by the Court of Appeals of a similar argument, advanced by the dissent in West View Hills, that the presumptive power of the president may be overcome “where the president has actual knowledge that a majority of the board of directors oppose the suit.” (West View Hills, 6 NY2d at 349 [Froessel, J., dissenting] [adding that requiring prior formal board action as was present in Sterling Indus, “would be to exalt form above substance”].) Yet the majority opinion in that case sustained the exercise of the president’s presumptive power in a case involving institution of a suit in the name of the corporation against two majority stockholders “to protect and preserve the interest of the plaintiff corporation.” (Id. at 348; see also Cicero Ind. Dev. Corp. v Robert, 63 Misc 2d 565 [Sup Ct, Onondaga County 1970, Simons, J.].)
The context of this case requires the court, in determining whether Bruce Heilman has met his initial burden on summary judgment, to sustain the exercise of the president’s presumptive, actual, implied power to act in executing a lease in the normal course of business, in the face of objections interposed by Glenn Heilman and his attorneys without any effort to convene the board for the purpose of restricting the president in his exercise of the management powers conferred on him by the bylaws and past practice in general, or for the specific purpose of forbidding the lease with Stockwood in particular. The rationale of West View Hills, Matter of Paloma Frocks and Rothman *715 & Schneider should, be applied here, and not the rationale of Sterling Indus, as it is applied in the Adlman line of cases. As stated in 328 E. 56 St. Rest, v Polldon Rest. (39 AD2d at 691), the facts of this case which show no board action either completed or attempted do not “call for . . . automatic application” of the rule of Sterling Indus.
Turning to the question of whether Glenn Heilman raises an issue of fact in response to Bruce Heilman’s motion, the court finds that the responding papers, when considered with the papers on Glenn’s initial motion, do not raise an issue of fact whether the president routinely exercised the plenary authority claimed by Bruce Heilman in transactions such as the one involved in this litigation. Glenn Heilman presents the minutes of a special meeting of the board held on January 4, 1978 in which the board resolved to lease the North Clinton Avenue property from Maynard Heilman with Maynard abstaining by reason of his conflict of interest (he owned the building alone in those years). Glenn Heilman also refers to the renewal of the same lease at a special meeting held on January 16, 1984 by a board vote in which Maynard abstained. Glenn acknowledges, however, that the 1995 renewal did not occur via a board of directors meeting, but refers to a copy of the 1995 lease which shows that the sworn acknowledgment signed by Bruce Hellman recited that he did so “by authority of the Board of Directors,” an acknowledgment missing from the Stockwood lease. Glenn Heilman also avers that formal board approval of increases of its line of credit were routinely obtained, that the board passed a resolution in December 1992 authorizing Bruce Heilman, then president, to explore acquisition of a Southern Tier wholesale electrical company, and that the board formally authorized Bruce Heilman to acquire Palmyra Electric Supply Company, Inc. and execute a sublease for the design center showroom in December 1986.
The formal board actions referred to by Glenn Heilman do not raise an issue of fact. That the original lease and first lease renewal were formally approved by the board, with Maynard abstaining because of his ownership of the premises, is not probative because board action of that kind was required by the disinterested directors, both under Business Corporation Law § 713 (a) (1) and the business judgment rule, a factor not present here because each shareholder/director would be affected in the same way by the Stockwood lease. The formal resolutions in 1986 and 1992 also are not probative because they occurred at a *716 time when Maynard was still in control of the business as chairman of the board, and Bruce was its president. The credit line increases are not probative unless the bank did not require formal board approval, a matter on which Glenn Heilman’s reply affidavit is silent. In any event, credit transactions of this kind are firmly classified in the New York cases as contracts in the ordinary course of a business that a president/general manager has presumptive authority to make. (Lee v Jenkins Bros., 268 F2d 357, 366 n 16 [2d Cir 1959]; Rathbun v Snow, 123 NY 343 [1890]; Kraft v Freeman Print. & Publ. Assn., 87 NY 628 [1881]; St. James Co. v Security Trust & Life Ins. Co., 82 App Div 242 [1st Dept 1903], affd 178 NY 560 [1904]; 2A Fletcher, Cyclopedia of Corporations § 602 [“the president may have such authority because expressly conferred . . . , or has general authority to manage the business”]; § 679 [“general rule is that an officer entrusted with the entire management and control of the corporation’s business has implied power to borrow money for the legitimate purposes of the corporation in its current and usual business, and that this officer need not have express authority to borrow money”]; 2 White, New York Business Entities ¶ B715.07 [2], at 7-177 n 15 [14th ed].) That the board on some occasions may have formally approved credit line increases does not detract from the rule in New York that a president conferred with the plenary management authority the bylaws of Maynards gave to its president has presumptive authority to borrow on his own for the corporate account in the ordinary course of business. That leaves the 1995 renewal which Glenn concedes was not authorized by the board, notwithstanding the recital in the acknowledgment to the contrary. Accordingly, I find that Glenn Heilman fails to raise an issue of fact.
The court is fortified in its decision in this respect by the very terms of the bylaws, and what it believes is a serious misreading of applicable law by plaintiff. For the reasons stated above, the bylaws confer plenary unrestricted management authority on the president, subject of course to duly authorized resolutions of the board. Business Corporation Law § 715 (g) confirms that the bylaws may confer such authority without running afoul of Business Corporation Law § 701, which only insists that “the business of a corporation shall be managed under the direction of its board of directors.” Thus, if the board fails to pass a resolution providing for such direction after one of the president’s decisions in the normal course of the business, the deadlock occurs after the fact under the cases the court has *717 taken care to explain above, not before, as urged by plaintiff. Accordingly, because Glenn Heilman does not establish or allege that the board passed on this issue at all, there is no circumvention of the board’s statutory management authority in this case. After West View Hills, the knowledge of informal opposition to a president’s exercise of his or her presumptive powers, critically relied on by the dissent, is not enough; “prohibition now equals an actual majority vote against action, and that alone.” (Roger J. Goebel, The Authority of the President Over Corporate Litigation: A Study in Inherent Agency, 37 St John’s L Rev 29, 80 [1962].) “Altogether, the language and the holding [of West View Hills] could not more clearly evidence the fact that this authority is inherent, imputed in law rather than derived in fact.” (Id.; see Restatement [Third] of Agency § 3.03, Reporter’s Note e [taking special note of Professor Goebel’s “study” and articulating the rule as set forth here].) The court has based its decision on both the historical practice of Maynards in regard to management by the president and the unrestricted authority granted to the president under the bylaws, but the real basis for decision must be, in light of West View Hills, the latter when not clearly contradicted by historical practice or a duly authorized board resolution.
Corporate Waste and the Business Judgment Rule
To the extent Glenn Heilman seeks recovery based upon his allegation that the lease agreement “will result in a waste of corporate assets” (see complaint ¶ 42), and with respect to the defenses offered in connection with the same, including the claimed application of the business judgment rule to what is a decision by a 50% shareholder/director sustainable only in his capacity as an officer of the corporation, a more difficult question is raised on summary judgment. Although Glenn Heilman’s single claim for relief does not cite it, the claim of waste is presented in the context of a Business Corporation Law § 720 action, which permits the action to be brought in the individual name of a director but limits the right of recovery to the corporation. (Bertoni v Catucci, 117 AD2d 892, 894 [3d Dept 1986]; Conant v Schnall, 33 AD2d 326, 327-328 [3d Dept 1970].) The statute incorporates a negligence standard of care (Rapoport v Schneider, 29 NY2d 396, 400 [1972]), but the business judgment rule nevertheless is applied unless it is alleged with particularity that the corporate decision in question “lacked a legitimate business purpose or w[as] tainted by a conflict of interest, bad faith or fraud.” (Amfesco Indus, v Greenblatt, 172 *718 AD2d 261, 264 [1st Dept 1991].) Thus, under New York law, the Business Corporation Law § 720 standard of negligence is not mutually exclusive with application of the business judgment rule. (Casey v Woodruff, 49 NYS2d 625, 643 [Sup Ct, NY County 1944] [“When courts say that they will not interfere in matters of business judgment, it is presupposed that judgment — reasonable diligence — has in fact been exercised”]; Joel B. Harris and Charles T. Caliendo, Who Says the Business Judgment Rule Does Not Apply to Directors of New York Banks ?, 118 Banking LJ 493, 509-510 [2001] [discussing Casey v Woodruff and concluding: “Contrary to the implication of the federal court decisions, in New York, the business judgment rule and an ordinary (or simple) negligence standard are not mutually exclusive”].)
The early suggestion that Bruce Heilman originally intended to open a competing business at the Carter Street location, and purchase the site to lease to the new business, an allegation of some substantial credibility given that Bruce Heilman was shown to have been in deposition less than forthcoming about his Carter Street negotiations with Appelbaum, has been demonstrated to have been fully abandoned by Bruce by the time he executed the Stockwood lease and presented it to Glenn Hellman. On the current state of the negotiations and in view of the lease actually executed, Glenn Heilman offers no admissible evidence of self-dealing on his brother’s part to defeat defendants’ claimed application of the business judgment rule.
The parties do not raise the issue whether self-interest is presented by the fact that each of the four children have an equal interest in the North Clinton Avenue property, which likely will be abandoned by Maynards if the lease is sustained. The business judgment rule does not protect transactions in which the directors engineering them have a personal interest. But here, Glenn Heilman does not allege, nor does he adduce any admissible evidence, that by virtue of the Stockwood lease and abandonment of the North Clinton Avenue property by Maynards, Bruce Heilman will “receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally.” (Marx v Akers, 88 NY2d 189, 202 [1996]; see Lippman v Shaffer, 15 Misc 3d 705, 710-717 [Sup Ct, Monroe County 2006].) Accordingly, the court perceives no self-interest impediment to application of the business judgment rule. (Bansbach v Zinn, 1 NY3d 1, 11 [2003] [“A charge of interest must be made with particularity”].)
*719 But a more fundamental problem is present. Bruce Heilman made the challenged decision solely in his capacity as an officer and president of the corporation, because he could not have made it in his dual capacity of 50% shareholder and one of only two directors. The New York Court of Appeals has spoken of the application of the business judgment rule mostly in terms of its application to duly authorized actions of the board of directors. (E.g. 40 W. 67th St. v Pullman, 100 NY2d 147, 153 [2003] [“business judgment rule is a common-law doctrine by which courts exercise restraint and defer to good faith decisions made by boards of directors in business settings”]; Marx v Akers, 88 NY2d 189 [1996]; Matter of Levandusky v One Fifth Ave. Apt. Corp., 75 NY2d 530, 537-538 [1990]; Auerbach v Bennett, 47 NY2d 619, 629 [1979]; Pollitz v Wabash R.R. Co., 207 NY 113, 124 [1912].) The question of its application to officers appears never to have been squarely considered, although in at least one case the Court lumped officers in with directors in its discussion of the rule:
“Moreover, New York’s business judgment rule (Business Corporation Law § 715 [h]; § 717 [a]) adds some weight to our analysis and conclusion. That rule requires corporate officers to perform their duties ‘in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances.’ It provides a measure of protection to a corporation’s officers and directors when they act in the over-all best interests of all the shareholders” (Lindner Fund v Waldbaum, Inc., 82 NY2d 219, 224 [1993] [emphasis supplied]).
What Appellate Division decisions there are also considering the business judgment rule in connection with officers appear to be in this same vein, i.e., lumping in officers with directors without an explicit decision required on the facts as to the rule’s applicability to action taken on behalf of a corporation by an individual defendant in his or her capacity as an officer, not as a director. (E.g. Konrad v 136 E. 64th St. Corp., 246 AD2d 324, 326 [1st Dept 1998]; DeCastro v Bhokari, 201 AD2d 382 [1st Dept 1994].)
The literature is divided on the issue, although most commentators side with protecting officers with application of the business judgment rule. (Compare Lyman EQ. Johnson, Corporate Officers and the Business Judgment Rule, 60 Bus Law 439 [2005] [arguing that the business judgment rule should not
*720 shield corporate officers to the degree that it protects directors], with Lawrence A. Hamermesh and A. Gilchrist Sparks, III, Corporate Officers and the Business Judgment Rule: A Reply to Professor Johnson, 60 Bus Law 865, 865 [2005] [“policy rationales underlying the development and application of the business judgment rule to corporate directors similarly justify application of the rule to non-director officers, at least with respect to their exercise of discretionary delegated authority”], Stephen M. Bainbridge, The Business Judgment Rule As Abstention Doctrine, 57 Vand L Rev 83 [2004] [same], and Gregory Scott Crespi, Should the Business Judgment Rule Apply to Corporate Officers, and Does It Matter?, 31 Okla City U L Rev 237, 237 [2006] [arguing a divergent view “under which officers would be allowed to invoke the business judgment rule when their conduct is challenged in shareholder derivative litigation, but not in lawsuits pressed by the corporation’s board of directors”].)[5] 6 An earlier study supported application of the business judgment rule to nondirector officers within the scope of their delegated authority. (A. Gilchrist Sparks, III and Lawrence A. Hamermesh, Common Law Duties of Non-Director Corporate Officers, 48 Bus Law 215 [1992].)
As demonstrated in these articles, the great weight of authority favors application of the business judgment rule to officers acting in their capacity as officers within the scope of their delegated authority. (1 American Law Institute, Principles of Corporate Governance: Analysis and Recommendations § 4.01, Comment a [1994].) I have chosen not to use the term “non-director officers” because, unlike as predicted by Hamermesh and Sparks in the general sense (Lawrence A. Hamermesh and A. Gilchrist Sparks, III, Corporate Officers and the Business Judgment Rule: A Reply to Professor Johnson, 60 Bus Law 865, 874 [2005] [“given the typical involvement of both directors and officers, and the typical overlap of roles and communications, it is likely to be fiendishly complex for a court, let alone a jury, to sort out when and where any given defendant is acting . . . in a distinct capacity as a director or officer”]), it is clear in this case beyond peradventure that Bruce Heilman was acting in his capacity as president when he executed the Stockwood lease. He *721 could not have done so in his capacity as one of only two 50% shareholder directors without authorization of the board itself acting as a board of directors.
Nevertheless, Bruce Heilman executed the lease within the scope of his delegated authority, as detailed at length above, and therefore is entitled to have that discretionary decision reviewed under the rubric of the business judgment rule just as if the board of directors had made the decision itself. Any other approach would encroach on a president’s/general manager’s presumptive powers as set forth in the New York case law set forth above, and would by judicial fiat effectively “surrender[ ]” a corporate board’s otherwise sustainable “delegation decision” and thereby “interfere with corporate management by subjecting the officer to greater scrutiny” than the board would be subjected to if it had made the decision itself. (A. Gilchrist Sparks, III and Lawrence A. Hamermesh, Common Law Duties of Non-Director Corporate Officers, 48 Bus Law 215, 237 [1992], quoted in Lawrence A.. Hamermesh and A. Gilchrist Sparks, III, Corporate Officers and the Business Judgment Rule: A Reply to Professor Johnson, 60 Bus Law 865, 875 n 61 [2005].) In other words the rationale of the business judgment rule as articulated in Auerbach v Bennett (47 NY2d 619, 629, 630-631 [1979]; Pollitz v Wabash R.R. Co., 207 NY 113, 124 [1912]) would be eviscerated for the range of board management functions that may be delegated to a president/general manager under the many decisions set forth above sustaining the president’s presumptive power if the business judgment rule is not applied to an officer’s decision within the range of his or her delegated authority.
Auerbach v Bennett presents an analogous situation of the application of the business judgment rule to the decision to delegate to a special litigation committee “all of the authority of the Board of Directors to determine, on behalf of the Board, the position that the Corporation shall take.” (47 NY2d at 625.) Although the Court held that the business judgment rule would not shield the process the delegated body used to arrive at a substantive decision on behalf of the corporation from judicial review to determine, inter alia, whether it was a “pretext or sham” (id. at 634-636), a consideration not present when as here the delegation was by virtue of the bylaws and to a corporate president, the Court held that, assuming no sham, the substance of the decision made by the delegated body involved commercial considerations commonly the subject of the *722 business judgment rule presumption (id. at 633-634), and that therefore “the determination of the special litigation committee forecloses further judicial inquiry in this case.” (Id. at 630.) It is true that, in Auerbach v Bennett, the body to which the board delegated the authority to decide on behalf of the corporation consisted of disinterested directors whereas here it was the corporate president, but the same considerations animated the decision to accord deferential review to the substantive decision made on behalf of the corporation in that case as are present in this case. Accordingly, the court agrees with defendants that the business judgment rule applies to Bruce Heilman’s decision to execute the Stockwood lease.
As set forth, no evidence or allegation is made that the transaction ultimately made by Bruce Heilman was self-interested. Bruce Heilman establishes on his motion the economic and other reasons for the decision to enter into the Stockwood lease and abandon the family-owned premises on North Clinton Avenue, and therefore he establishes his good faith. Glenn Heilman fails to raise an issue as to whether the decision was not made in good faith. (See Freer v Mayer, 223 AD2d 667, 668 [2d Dept 1996].) In his reply affidavit, Glenn Heilman acknowledges the substantial repairs that the North Clinton Avenue building needs but disputes his brother’s economic reasoning point by point. Yet he also acknowledges that he has received legal advice “that whether Bruce or I am right as to the advisability of this proposed move is not the issue before this Court” (reply affidavit ¶ 11), and thus Glenn implicitly, if not explicitly, agrees that the business judgment rule should be applied to the substantive decision itself. (See also Glenn Heilman’s reply mem of law at 12 [deadlock remedies under the Business Corporation Law “do not include asking a court to make business judgments as to which of two competing positions is more sound”].)
Finally, there is no suggestion of fraud or unconscionability in the transaction. “[A]bsent claims of fraud, self-dealing, unconscionability or other misconduct, the court should apply the business judgment rule and should limit its inquiry to whether the action was authorized and whether it was taken in good faith and in furtherance, of the [company’s] legitimate interests.” (Gillman v Pebble Cove Home Owners Assn., 154 AD2d 508, 508-509 [2d Dept 1989].) The court’s review of the voluminous papers submitted on these motions uncovers no credible evidence of fraud, unconscionability or self-dealing sufficient to create a question of fact on this issue.
*723 Bruce Heilman’s cross motion for summary judgment is granted in its entirety. Likewise, Stockwood’s cross motion for summary judgment is granted to the extent it sought dismissal of plaintiffs complaint as against it. Glenn Heilman’s motion for summary judgment is denied in all respects. The alternative relief sought by Stockwood is hereby rendered moot.

. (Compare 2 White, New York Business Entities 11 B715.06 [4], at 7-168 [14th ed] [“The doctrine of apparent authority is used when a third party seeks to prove a relationship that exists between the corporation and himself or herself’], with id. at 7-169 [“Implied authority, on the other hand, is actual authority — authority which a principal actually intends his or her agent to possess as a reasonable incident of his or her express authority”].) On the cross motions for summary judgment brought by Bruce and Glenn Heilman against each other, it is implied actual authority that is concerned. On the motion brought by the new landlord, Stockwood, principles of apparent authority must be consulted.

. The court notes that Glenn Heilman did not include a copy of his own deposition as part of the papers submitted with his motion, the first one filed.

. Plaintiffs repeated citation of Knapp v Rochester Dog Protective Assn. (235 App Div 436 [4th Dept 1932]) is unavailing. The question of inherent or implied authority was not present in that case, “[t]he record . . . [being] barren of evidence showing that any authority was ever delegated to the secretary, or to any other officer . . . , to enter into this alleged agreement.” (Id. at 439.) This point was implicitly recognized in Gumpert v Bon Ami Co. (251 F2d 735, 738-739 [2d Cir 1958]) which, though it cited Knapp for the proposition that an individual director/member of the board’s executive committee does not “normally carr[y] with it the inherent power to hire corporate officers,” separately considered whether such implied authority might be vested in the “chief executive officer of defendant.” (Id. at 738 n 1, 739 [ultimately concluding that the inherent powers of a chief executive officer to enter into employment contracts on behalf of the corporation would not include the power to hire corporate officers without an express delegation of the board].) In any event, the contract in Knapp was executed by a self-interested director/officer, was otherwise proscribed by the bylaws, and provided “no new benefits resulting to the corporation.” (Knapp, 235 App Div at 440.)

. Given the decision in Polldon Rest, to affirm Special Term’s refusal to dismiss the complaint on the asserted ground that the action was commenced by the corporate president without presumptive authority, plaintiffs repeated citation of this case for the proposition that Bruce Heilman had no such similar authority to execute the lease (original mem at 20) and that such authority if he had it was negated by plaintiffs expressions of disapproval without formal or other official board action on the matter (reply mem at 8) is inexplicable.

. Although a statutory Business Corporation Law § 720 action belongs to the corporation despite being brought in an individual director’s name, the corporation did not authorize this lawsuit by Glenn Heilman via a board of directors vote. Accordingly, the rule advocated in the Crespi article would not be invoked in this case.