OPINION OF THE COURT
Kenneth R. Fisher, J.
In denying Bruce Heilman’s summary judgment motion, the Appellate Division found:
“The record establishes that, pursuant to the bylaws of ‘Maynard’s Holding Corp.,’ the president, i.e., defendant, was vested with ‘the management of the business of the corporation,’ and he thus had the presumptive authority to enter into contracts on the corporation’s behalf in the course of the business of the corporation.” (Hellman v Hellman, 60 AD3d 1468, 1468 [2009].)
Acknowledging that the record contained evidence that Bruce Heilman signed leases for the corporation in the past, the Appellate Division observed that plaintiff did not agree to the lease at issue here and did not concede Bruce Heilman’s authority to bind the corporation to it. (60 AD3d at 1469.) Further, the court “conclude[d] that plaintiff raised an issue of fact whether, pursuant to past practice, defendant had the authority to lease property without prior authorization by the Board.” (Id.) According to the Appellate Division, this conclusion followed from the fact that the record included evidence “that the previous leases signed by defendant were the subject of Board resolutions granting defendant the authority to sign them, or they were signed by defendant ‘by authority of the Board of Directors of [the] corporation.’ ” (Id.)
The matter came to trial, and now I find that plaintiff failed to carry his burden of presenting preponderant proof that the past practices of the corporation circumscribed Bruce Heilman’s presumptive power to bind the corporation to the Stockwood lease. Nor did plaintiff adduce preponderant proof that past practices revealed that the president did not have in practice, at least with respect to leases of this kind for corporate business, what otherwise would be described as the full measure of presidential power conferred on him by the bylaws and existing case law. Familiarity with the court’s previous decision (19 Misc 3d 695 [2008]) is assumed.
If the rule is that, in the absence of a contrary provision of the bylaws or formal resolution of board of directors, the presi *267 dent has presumptive power to enter leases in the ordinary course of the business of the corporation, the past practice of the corporation may be seen as circumscribing such power only if either (1) that practice was developed by the corporate actors as a means of curtailing the president’s presumptive power, or (2) that practice was established by the corporate actors for the purpose of making clear that the president had no such actual, implied power to sign such leases in the first place notwithstanding what might have been permissible under the rule of West View Hills v Lizau Realty Corp. (6 NY2d 344 [1959]); Matter of Paloma Frocks (Shamokin Sportswear Corp.) (3 NY2d 572, 575 [1958]); and Rothman & Schneider v Beckerman (2 NY2d 493, 497 [1957]). (Compare Sterling Indus. v Ball Bearing Pen Corp., 298 NY 483 [1949].) The mere existence of prior board authorizations, or lease signings “by authority of the Board” would not carry plaintiff’s burden of proof unless the circumstances of their passage or making suggest that the board intended curtailment of the presumptive power the West View Hills trilogy of cases clearly say the president has. That is to say, the prior board approvals and lease signings are relevant only if they were engineered in advance of the leases as an intended limitation on the president’s presumptive power or for other reasons suggesting that the corporate actors did not intend to vest their president with the full panoply of presumptive powers New York case law recognizes in a corporate president when no “formal interdiction” by board resolution occurred and no limiting provision in the bylaws exists. For example, in one of the cases cited by the Appellate Division (56 E. 87th Units Corp. v Kingsland Group, Inc., 30 AD3d 1134 1134-1135 [1st Dept 2006]), the court found that the corporate president “lacked authority” to take out the loan in question because “[t]he bylaws, and plaintiffs own past practice, make it clear that the president required board authorization to enter into such transactions.” Here, because no provision of the bylaws circumscribed the president’s authority, the court is limited to the proof of Maynard’s past practices, adduced at trial, to determine whether such past practices “make it clear that the president required board authorization.” (Id. at 1134.)
First, no direct proof was adduced that any of the corporate actors, either when signing board resolutions concerning the leases, or the leases themselves with the “by authority of the Board” legend, expressly intended that the prior leases or like transactions signed by the president required prior or even *268 ultimate board approval.[1] There were no expressions of presidential power limitation by any corporate actor in any of the prior dealings of the corporation. Second, the circumstances of the generation of prior board minutes in connection with the prior leases and associated agreements signed by the president show that no limitation of the president’s presumptive powers was intended, nor do these circumstances show that the president in the first instance and as a general matter lacked the full delegation of powers clearly conferred by the bylaws.[2]
Here, the purpose of the board approvals during Maynard Heilman’s reign as president was to cover the interested transaction aspect, or to satisfy Maynard’s fastidious desire to paper transactions after the fact with corporate board minutes. During Bruce Heilman’s reign, the principal purpose of generating minutes was to cover the acquisition and development of the design center on Winton Road, primarily for the benefit of the lenders which demanded it be covered by board resolutions complying with the Business Corporation Law.[3] These transactions, or at least the ones covered by board minutes, do not appear at all to have been an intended restriction of the president’s power (the corporate decision to go forward with the transactions having been previously made by the president, either Maynard or Bruce, within the scope of their fully delegated presidential powers under the bylaws). In other words, the mere existence of board resolutions supporting the prior leases may, as the Appellate Division held, create a question of fact whether past practice circumscribed the inherent authority of the president, but they would only carry plaintiffs burden at trial on the ultimate issue if they were shown to have been intended to circumscribe the president’s otherwise inherent authority. *269 Plaintiff failed to adduce preponderant proof of such intention, either express or implied, at the trial, except by reference to the subjective operation of plaintiffs mind on the subject expressed shortly before Bruce Heilman executed the Stockwood lease (plaintiff had, months earlier, written his brother acquiescing in the lease, while not wholeheartedly supporting it).[4] Accordingly, Bruce Heilman had implied actual and presumptive authority to enter into the lease, which I find, contrary to plaintiffs contention to the contrary (again supported only by his subjective view of the matter as a “big” change — so was the decision to expand into the Southern Tier but plaintiff regarded this as within the usual course), was in the regular course of the business of the corporation.
Plaintiff pláces great weight on the fact that, though he did not make the contention on the summary judgment motions, plaintiff had no right to call a board meeting under Maynards’ bylaws. This argument is made in the context of plaintiffs umbrella contention that Sterling Indus. v Ball Bearing Pen Corp. (298 NY 483 [1949]) applies to this case on the facts. Plaintiff also relies on Tidy House Paper Corp. of N.Y. v Adlman (4 AD2d 619 [1st Dept 1957]). (Trial mem of law on behalf of plaintiff Glenn M. Heilman, dated Dec. 11, 2009, at 13-18; plaintiffs post-trial mem of law at 16-17.) Plaintiff draws from this an immutable rule that a “formal refusal by the board was unnecessary where one director on [a] two-man board knows that [the] other director was opposed to action.” (Id. at 17, citing Adlman.)
*270 The first answer to this is that was not the issue of fact identified by the Appellate Division. But even taken on its own terms, the point has no merit. While it is true that plaintiff did not on summary judgment make the contention that the bylaws did not permit plaintiff to convene a board meeting, the court had before it the bylaws themselves which plainly reveal this. And that is why the court pointed out in extended discussion:
(a) that the portion of Adlman relied on by plaintiff (4 AD2d at 621), was effectively overruled by Matter of Paloma Frocks (3 NY2d at 575) and West View Hills,
(b) that Adlman relied on that court’s prior decision in Matter of Paloma Frocks (Shamokin Sportswear Corp.) (1 AD2d 640 [1956]) which as stated above was overruled by the Court of Appeals on that very point,
(c) that West View Hills ruled in favor of Sterling Indus.’s inapplicability to a situation such as this over the dissent which adopted plaintiff’s position (West View Hills, 6 NY2d at 349 [Froessel, J., dissenting] [the presumptive power of the president may be overcome “where the president has actual knowledge that a majority of the board of directors oppose the suit” (emphasis omitted); adding that requiring prior formal board action as was present in Sterling Industries “would be to exalt form above substance”]), and
(d) that if the law was as stated by plaintiff, cases such as 328 E. 56 St. Rest. v Polldon Rest. (39 AD2d 689, 691 [1st Dept 1972]), Berma Mgt. Corp. v 140 W. 42nd St. Realty (21 Misc 2d 571, 572-573 [1960]), and Cicero Ind. Dev. Corp. v Roberts (63 Misc 2d 565 [1970]) could not have been decided as they were. (19 Misc 3d at 710-711, 712-715.)
Furthermore, if the law was as stated by plaintiff, there would have been no need for the trial the Appellate Division ordered. The facts indeed were undisputed that plaintiff opposed the lease (except for one conciliatory letter written six months before the operative events). Under plaintiffs interpretation of the law, the record before the Appellate Division would have required (1) denial of Bruce Heilman’s motion on the ground of failure to meet his initial burden on summary judgment, not on the stated ground that “plaintiff raised an issue of fact” (Hellman v Hellman, 60 AD3d at 1469), and (2) a grant of plaintiffs motion for summary judgment. Yet the Appellate Division did neither, thus making its implicit decision that Bruce satisfied his initial burden of proof on summary judgment res judicata on the applicability of Sterling Indus, to these facts as interpreted *271 by the overruled or abrogated portion of the Appellate Division opinion in Adlman to which plaintiff now refers. This court has no power to revisit the issue in the manner suggested by plaintiff, and even if it did the court would not revisit the matter on the strength of its prior reasoning on the summary judgment motion.
The court’s decision in Rothman & Schneider v Beckerman (2 NY2d 493, 497 [1957]) confirms this view. As pointed out in the original decision (19 Misc 3d at 711-712), the Rothman & Schneider court drew a sharp distinction between the circumstances presented here and the case of formal board action. (Rothman & Schneider, 2 NY2d at 497 [result in Sterling Indus. “turned largely on the fact()” that “plaintiffs board of directors actually refused, when requested to act (i.e., by the president himself), to give the president permission” (emphasis supplied)].) The court went further, however, in a passage not quoted in the original decision: “Where there has been no direct prohibition by the board, then, it has been held, the president has presumptive authority, in the discharge of his duties.” (Id. [emphasis supplied] [collecting cases].) In the very next sentence, the Court added: “And, when directors deadlock over corporate litigation and the president hires an attorney to sue or defend for the corporation, he may proceed and recover compensation for his work.” (Id. at 497-498.) In so holding, the Court cited Matter of Bernheimer (4 Misc 2d 503 [Sup Ct 1943], affd 266 App Div 868 [1943]), which was described as follows:
“In the Matter of Bernheimer (43 N. Y. S. 2d 300, affd. 266 App. Div. 868) the president of a corporation had engaged an attorney to represent it in condemnation proceedings involving the taking of its property. The board of directors was deadlocked on the hiring of the attorney, and one half of the directors had protested his employment. Nevertheless, the court upheld the authority of the president to retain counsel and the right of the attorney so employed to an allowance for his services.” (Sterling Indus., Inc. v Ball Bearing Pen Corp., 273 App Div 460, 467 [1st Dept 1948], revd 298 NY 483 [application of Bernheimer to the facts in Sterling Indus., but not on the description of Bernheimer’s actual holding].)
It appeared that half of the board of directors “protested in writing against the retaining of Hollander and Bernheimer, but took no other affirmative action.” (4 Misc 2d at 506.) That is *272 the situation here, and Rothman & Schneider’s citation of Bernheimer for the proposition that the president has the presumptive power even in the face of informal deadlock, particularly after emphasizing the distinction between such informal deadlock and the situation in Sterling Indus., in which “plaintiffs board of directors actually refused, when requested to act,” makes clear that plaintiff cannot prevail where “the board of directors, not requested to pass upon the matter, took no action.” (Rothman & Schneider, 2 NY2d at 497, 498 [emphasis supplied].) The arguments plaintiff makes here for Sterling Indus.’s application mirror those made in the dissent in West View Hills (6 NY2d at 348-352 [Froessel, J., dissenting]), where everyone concerned knew that a majority of directors were opposed, not just that they were deadlocked.[5] (See also Betra Data, Inc. v Healthmasters, Inc., No. 81 Civ 4215 [CBM], 1982 US Dist LEXIS 10599, *4 [SD NY Jan. 22, 1982] [“This statement, even assuming that it represents the sentiment of one-half of the board of directors . . . , is not the type of ‘direct prohibition by the board’ contemplated by the Court of Appeals in Rothman & Schneider, Inc. v Beckerman, supra, 2 N.Y.2d at 497”], cited in Harry G. Henn & John R. Alexander, Laws of Corporations and Other Business Enterprises § 225, at 603 n 39 [3d ed 1983].)
Finally, the argument that plaintiff had no power under the bylaws to call a board meeting before or after the lease was signed is of no moment. First, there was evidence at trial that I credit that he made no effort to convene the board and that he did not learn of his powerlessness to do so until litigation was well under way. Moreover, he made no effort under the Business Corporation Law to dissolve the corporation on the ground of dissension and deadlock (Business Corporation Law § 1104), or an asserted breach of fiduciary duty. (Business Corporation Law § 1104-a.) Second, case law holds as follows:
“The fact that the president in the instant case knew that two of the four directors opposed this action and deliberately failed to call a meeting to pass upon the question does not preclude him from instituting the suit (West View Hills v. Lizau Realty Corp., 6 N Y 2d 344, 349, supra; Matter of Paloma Frocks [Shamokin Sportswear Corp.], 3 N Y 2d 572, 575, supra).” (Berma Mgt. Corp. v 140 W. 42nd St. *273 Realty, 21 Misc 2d at 572-573, cited with approval in Roger J. Goebel, The Authority of the President Over Corporate Litigation: A Study in Inherent Agency, 37 St. John’s L Rev 29, 76 [1962] [“lower court has quite properly so held even when the president deliberately refrained from calling a board meeting because he knew a deadlock would result”— “his presumptive powers prevailed since there was no ‘formal interdiction’ extensively canvassing Sterling Indus, and the three major Court of Appeals cases since, set forth above, and fully embracing West View Hills]; see Restatement [Third] of Agency § 3.03, Reporter’s Notes e [taking special note of Professor Goebel’s “study” and articulating the rule as set forth here].)
Accordingly, the circumstance that plaintiff would have been unable to convene a board meeting does not carry plaintiffs burden of proof, either alone or in combination with the other credible evidence adduced at trial. As stated in 328 E. 56 St. Rest. v Polldon Rest. (39 AD2d at 690), the facts of this case which show no board action do not “call for . . . automatic application” of the rule of Sterling Indus.
Finding that Bruce Heilman had actual authority to execute the lease makes any inquiry into the question of apparent authority “unnecessary.” (Decana Inc. v Contogouris, 55 AD3d 325 [1st Dept 2008]; Stitt v Ward, 142 App Div 626 [1st Dept 1911].) Accordingly, judgment is entered dismissing the complaint against Stockwood.
Finally, although the parties have not made arguments in their closings on the issue whether Bruce Heilman’s decision to enter into the Stockwood lease was fair to the corporation and its shareholders, his testimony on the subject, which I credit, more than establishes that the decision was reasonable given the economic realities of the North Clinton Avenue and Carter Street sites, was made in good faith despite his short-lived plan to compete with Maynards, and is protected by the business judgment rule for the reasons stated in the court’s earlier decision and order (19 Misc 3d at 717-722).

. Plaintiff conceded on cross-examination, for example, that the 1995 lease renewal for the North Clinton Avenue property occurred without a hoard meeting concerning it, that no minutes were prepared in connection therewith even after the fact, and that Bruce Heilman did not consult with him on it, despite the recital on the lease on page 9 (exhibit 20) “by the authority of the Board.”

. Plaintiff conceded on cross-examination, for example, that no board minutes reflected the corporate purchase of the North Clinton Avenue property or the deed to Maynard Heilman. He conceded further that no board meeting or meeting minutes were developed in connection with the 1995 to 2005 State Street lease between the individual Heilmans and the corporation, or the 1997 termination of that lease.

. The design center lease itself (exhibit 35) was executed without an opinion letter, a secretary’s certificate, a board resolution, or board minutes, despite the fact that the lease term was for 15 years (the Stockwood lease had only a five-year term).

. Plaintiff presented himself in his testimony as devoted to his father, deeply respectful of him as an astute businessman, and deeply grateful for his generosity, especially in connection with the North Goodman Street lease. But his assessment of his own role in the corporation’s management was wholly unrealistic, especially given the circumstances of his return to corporate headquarters from years of customer field work wholly divorced from firm management, Bruce Heilman’s plenary control over the firm after Maynard ceased being an officer or director of the company (e.g., the 1995 North Clinton Avenue lease renewal without discussion or approval of the board, the continued leasing of the State Street property after operations there moved to North Clinton, and the decision to terminate that lease without discussion or board approval), even after plaintiff returned from the field, and the relationship of the brothers after plaintiff stopped calling on customers and returned to the corporate offices. On the latter point, whether or not plaintiff returned from the field “to protect his interests,” as Bruce claimed in his testimony, there was no credible evidence that, when plaintiff took up shop in the corporate offices, the management of the company by Bruce was in any significant measure curtailed.

. Plaintiff conceded Bruce Heilman’s power as president to institute and settle legal proceedings without board approval, as indeed he conceded Bruce’s authority to enter into transactions having far more financial impact on the company than the five-year Carter Street lease.